And we will last hear argument in the case of Ju v. Holder. Good morning. May it please the court, Christie Shuto representing the petitioner Li Shengzhu. I'm going to refer to the Trafficking Victims Protection Reauthorization Act of 2008 as the TVPRA, to save time. And I'll start by addressing the motion to remand filed on Tuesday, and I'll focus my arguments on the motion to remand. And our position was- Speak up a little. I'm having trouble hearing you. Okay. I'll try to, Your Honor. I'll raise my voice. We can agree with the respondent that the court should not address the impact of the TVPRA on petitioner's case in the first instance on this petition for review. Where we disagree with respondent is the position that because of the TVPRA, the court is foreclosed from considering the merits issues presented on petition for review. We submit that because the merits issues are dispositive of petitioner's asylum application, and it is those issues that are right for review that the court should address the merits issues first. Counsel, I'm going to ask you both to help us with this because we don't have a lot of experience with this statute. And I'll address my questions to you, Mr. Shuto, but Ms. Taylor, you can take a swing at them as well when you're up at bat. As I understand what the government is asking for here, it wants to remand this case for the third time to the BIA, but this time to ask it to consider whether Mr. Zhu's claim should be sent back down to an asylum officer to review it. And my question is, what's the point of doing all this? Normally, as I understand the way these proceedings work, an asylum officer reviews the initial application, makes a determination as to whether there's an arguable basis for asylum, and then refers it to the immigration court. Here we've had a full hearing on the merits by the immigration judge. He's rendered findings of fact and so on. That's been reviewed now twice by the BIA on the merits, and now it is before us on Mr. Zhu's second petition for review in the Ninth Circuit. What are we going to accomplish by sending this back down to level one at the asylum officer? I mean, do you really want, is it a T visa under the TVPRA, the special visa that's afforded? I don't think my client would qualify for a T visa. That's what I'm saying. We've never asked for that. And I don't think that remanding all the way back down to an asylum officer would accomplish anything. In this case, under these circumstances where the immigration judge has already denied the asylum application and the Board of Immigration Appeals has twice affirmed that denial, I think in order for there to be any consideration of whether the TVPRA applies to this case, we would have to prevail on the merits issue, which is whether a petitioner suffered past persecution and maintains a well-founded fear of future persecution on account of a particular social group. Here we're saying it's his nuclear family. If we don't prevail on that issue, I don't think there's any point in remanding it back to the BIA. I'm doubtful whether they would send it to an asylum officer where you've had a procedural history like this, where there have already been three decisions by the agency. I don't even see that your client is within the zone of individuals that the statute is designed to protect. As I read the legislative history in the text of the statute itself, it appears to be worded to protect underage victims of white slavery and involuntary servitude who are somehow brought to the United States and found under awful conditions. And it speaks in terms of treating them like we would treat juvenile wards of the court, finding safe and secure, least restrictive places to put them, like foster homes and that sort of thing. As I understand it, your client is now 22 years of age. What is his custodial status today? He is living independently. With his cousin in Minneapolis? In, I think, New York now, in Brooklyn. Same cousin, though, that he initially was traveling to when he got snatched at the airport? Yeah, I'm not sure if it's the same cousin, but he's living in Brooklyn by himself and supporting himself. And he is no longer a minor. There is that provision of the TVPRA that offers a certain protection for unaccompanied minors, and my client was an unaccompanied minor when the proceedings began, subsequent. But not when the Act was effective, right? Correct. Yeah, he was. Did he reach majority after the effective date, or before the effective date of the Act? Yeah, long before the effective date of the Act. It was actually before his hearing in front of the immigration judge, I think. Yeah, by my calculation, I think he was 18 years old in 2005. They moved him to the CCA detention facility in Otay Mesa before his hearings. I think they moved him as soon as he turned 18. When we filed the application, he was an unaccompanied minor. Why don't we do this? It's a little unorthodox. Counsel, why don't we have you sit down and let's hear from the government. Absolutely. Good morning, Your Honors. Ms. Taylor, good morning. What are you up to here? Well, I think what the government is up to is we saw this opportunity to actually possibly help an alien, and clearly he falls within the effective dates. And so that's... Wait a second. The statute didn't become effective until March of 2009. Well, actually, at subsection H, it says... Give me the citation. Okay, it's USC 1232H. Okay, 1232. It's on page 8 of what I've got. Cynthia, do you have it? Okay, we're with you. Okay, so Mr. Zhu does come. He is impacted by this act, the TVPRA, because under H2, it says it will apply to all aliens in the United States in pending proceedings before, and then if you jump down to the next line, pending before federal appeals on the date of the enactment of this act. Right, which was March... The date of enactment was what? The date of enactment was December 23, 2008. So it became effective 90 days thereafter. It became effective 90 days thereafter. And when it became effective, he had already attained majority, even though his case was still pending. Is that correct? Well, he had attained majority, but his case was still pending, and he was, and I'm going to use the acronym UAC again to make things more efficient, an unaccompanied alien child, UAC, at the time he arrived. But not when the act became effective. That's correct. So prior to the time of the effectiveness of the act, he had attained the age of majority. And as I read elsewhere in the statute, the definition of a minor means less than 18. Yes. He wasn't less than 18 when the act became effective, so why does this statute apply to him at all? Because he was an unaccompanied minor at the time he arrived. But the act isn't retroactive to the date on which he entered the United States. I agree with you if he were still under age 18 and his case were pending before this court, then I would agree that H-2 applies. But when he doesn't even meet the statutory definition of a UAC on the effective date of the statute, how can it possibly apply to him? Well, the agency is trying to work out those details. But at the moment, that's not a question to which we give Chevron deference. That's a strict question of statutory interpretation. And the last time I read Marbury v. Madison, that was our job. Well, certainly we don't want to usurp your job, sir. Thank you. But what expertise is the BIA going to bring to the purely legal question of whether or not we ought to grant your motion under the TVERA when we're not convinced that it even applies to this particular petition? Well, the determination, according to the TVERA, the determination of who is a UAC goes to DHS and HHS. But why can't we just look at the statutory definition and conclude that he's too old to be a UAC? He may very well be unaccompanied. He may be very well emancipated and living in Brooklyn. But he's 22 years old, and he's not a minor child anymore. We can't put him in foster care. We can't put him in a juvenile facility. We can't make him a ward of the court at this point. He's too old. Well, one thing, you know, and what the remedies would be, again, we're still trying to develop this. I understand the remedies thing I could see might very well be within a Chevron role for the agency. But I don't think you get to remedies until you answer the legal question as to whether or not the statute even applies to him. You know, if we grant the motion and write an opinion that says that it's appropriate to remand because this 22-year-old was under 18 at the time he entered the United States and his case was still pending, that means that the agency has to go back and review all of the cases in which it's possible for petitioners to have been treated under this act. That's right. That would be a burden for the agency, but it's a burden that at the- Is that what you're asking us to do? And in this case, that is what we are asking you to do so that the board and then, you know, possibly DHS and HHS can take a first stab at how this statute works. And if I could go back to your question, Judge Tallman, one of the things you asked me, what benefit could he possibly have, Mr. Zhu, if this went back? One thing that he might be able to get, you know, assuming that it goes back, is that he would have his asylum application adjudicated possibly by an asylum officer, which has not happened in this case. Why do you want to do that? You've already got a full adjudication on the merits on the record before the immigration judge, which has now twice been reviewed by the Board of Immigration Appeals. Why wouldn't the results of that proceeding be raised judicata and collaterally stop the petitioner from, unless you're prepared to dismiss the proceedings entirely, I suppose you could do that. Well, again, you know, I don't have definite answers, but one advantage or one possibility would be that in front of an asylum officer, it's a non-adversarial proceeding. But it's the same question. Was he the victim of persecution, and is he entitled to claim protection as a member of a family unit, which seems to be, if you accept his testimony as credible, to be the subject of persecution by virtually everyone in China? It's very – The latter may be an old statement. Bad things have befallen this family. Let's put it that way. Right. You know, the murder and the dead and all that. How's my government going to help Mr. Zhu? That's where I'm still puzzled. Right. And I wish – we also have very little experience with this act. We can't find any case law. There's no legal commentary. And what little legislative history I looked at looks like it wasn't even intended for people like Mr. Zhu. It was intended for the karaoke girls who get found in the Northern Mariana Islands having been envigled there by unscrupulous bar owners into a life of prostitution and forced servitude. That's not Mr. Zhu. Well, Your Honor, certainly we can brief this for the court if you'd like. But in terms of what would be accomplished and exactly the mechanics of it, I'm not in a position to answer your question. Let me ask you both a question. We talked about this amongst ourselves, and we'll offer it to you as an option. Would you like to join me? Go ahead. We are concerned that if we grant the government's motion, what we're really doing is just unduly prolonging the administrative review process, which has already been dragging on for more than four years. Would you be amenable, if we enter an appropriate order, vacating submission of this case to meet with our circuit mediator in San Francisco and see if you can work out some kind of an agreed-upon resolution of Mr. Zhu's status that doesn't involve having to start all over again at the asylum officer level? Well, certainly I'll speak for the government. We would be amenable to working with a mediator, but not necessarily under the terms that, you know, we wouldn't be starting all over. Well, I'm not trying to define the scope of your mediation. What I'm really asking both of you, because the initial representation from Mr. Chautau was that he was opposed to the layman, how about if you two sit down and talk with one of our mediators and confer with your respective clients to see if there's something that can be worked out? If the government really wants to afford relief to Mr. Zhu in some way, that's what our mediators are for. Are you willing to try that? I'd be willing. Okay. Well, what we can do then, if my colleagues agree, is we'll enter an order vacating submission in the case. We'll refer you to mediation. We'll ask you to report back, say, in 60 days and tell us whether or not you think that you're going to make some progress here. If the answer is no, if for whatever reason you have problems with your clients, you can't come to terms, then we can always reschedule the case for argument, maybe by telephone or video, or have you come back here to Pasadena, and we'll pick it up at that point. Does that sound reasonable? That sounds reasonable, yes, to me. And also, Mr. Schulte, I want to give you the option, if you wish, although I'd like you to try the mediation first, you are certainly welcome to file something in writing in response to the government's motion if your mediation efforts fail. Okay. And if you'll just mention that in your written report back to us in 60 days to let us know where you stand, I will give you the right to do some research yourself and see if you can help us on the law. Okay. All right? Anything further from the panel? No. All right. Thank you very much. Order to that effect, and the case will vacate submission and enter an order to that effect. All right. Thank you. Thank you both. I believe that takes care of our business for the day, and we are adjourned for the week. Thank you, Mr. Brown, for your good services this morning. All rise. This court stands adjourned.
judges: Lawson, Hall, Tallman